# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| BAY CAPITAL FINANCE, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0539-KSJM |
| | ) | |
| BARNES AND NOBLE | ) | |
| EDUCATION, INC., MICHAEL P. | ) | |
| HUSEBY, EMILY CHIU, DANIEL | ) | |
| DEMATTEO, DAVID GOLDEN, | ) | |
| JOHN RYAN, JERRY SUE | ) | |
| THORNTON, AND DAVID WILSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 19, 2019
Date Decided: March 30, 2020

Sean J. Bellew, BELLEW LLC, Wilmington, Delaware; David A. Felice, BAILEY & GLASSER LLP, Wilmington, Delaware; Martin F. Cunniff, RUYAK CHERIAN LLP, Washington, D.C.; *Counsel for Plaintiff Bay Capital Finance, L.L.C.*

Raymond J. DiCamillo, Robert L. Burns, Kevin M. Gallagher, Eliezer Y. Feinstein, Brian S. Yu, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Adam Offenhartz, Aric H. Wu, David F. Crowley-Buck, Peter M. Wade, GIBSON, DUNN & CRUTCHER LLP, New York, New York; *Counsel for Defendants Barnes and Noble Education, Inc., Michael P. Huseby, Emily Chiu, Daniel DeMatteo, David Golden, John Ryan, Jerry Sue Thornton, and David Wilson.*

**McCORMICK, V.C.**

The plaintiff desired to nominate a slate of directors for election at the defendant company's 2019 annual meeting. The company's advance notice bylaw required the plaintiff to own stock in record name by the deadline for nominating directors. The plaintiff failed to become a record holder before the deadline, and the company thus rejected the plaintiff's nomination notice. Undeterred, the plaintiff commenced this litigation to require the company to accept its nomination notice. In its verified complaint, the plaintiff claimed that it relied to its detriment on language in the company's 2018 proxy that inaccurately described the method for computing the nomination deadline. The plaintiff further alleged that the board chairman rejected the plaintiff's nomination in bad faith due to a personal animus against the plaintiff's principal. Based on the plaintiff's claim that it relied on the inaccurate proxy language, the plaintiff was granted expedited proceedings toward a hearing on a motion to preliminarily enjoin the annual meeting.

Discovery pulled at the plaintiff's verified allegations as if they were loose threads on a sweater, unraveling them line-by-line to reveal the naked truth. In a rather shocking turn of events, discovery revealed that the plaintiff never relied on the inaccurate proxy language. In fact, the plaintiff first learned of the inaccurate language after it was too late to comply with the bylaw deadline. The plaintiff's primary case was thus a bold-faced lie. Naturally, the plaintiff's motion for a preliminary injunction was denied. Thereafter, the company issued corrective

disclosures and the annual meeting took place, mooting most of the plaintiff's claims.

The defendants have moved for summary judgment on what little remains of the plaintiff's case—the claim that the chairman breached his fiduciary duties when refusing the plaintiff's nomination notice. This decision grants that motion. The plaintiff relies on language in the company's bylaws granting the chairman the discretion to refuse non-compliant nomination notices. The undisputed facts are that it was the full board, and not the chairman acting pursuant to this grant of authority, that rejected the plaintiff's nomination notice.

The defendants have also moved for fees and costs incurred in connection with this litigation. This decision grants most of that motion as well. Not only was the plaintiff's primary claim based on a lie, but the plaintiff also obstructed discovery directed to its principal. Either one of these insults likely would have been sufficient grounds for shifting fees to a degree; the presence of both makes the outcome unavoidable.

## I.    FACTUAL BACKGROUND

The facts are drawn from the materials presented in the defendants' motion for summary judgment.

## A. Plaintiff Misses the Deadline for Nominating Directors for Election.

Plaintiff Bay Capital Finance, L.L.C. ("Bay Capital" or "Plaintiff") is a private investment fund formed under Delaware law.[1] Sunil Suri is Plaintiff's Principal and Managing Member.[2]

Defendant Barnes & Noble Education, Inc. (the "Company") provides solutions for the education industry.[3] The Company is a Delaware corporation formed through an August 2015 spin-off from Barnes & Noble, Inc.[4] Its stock trades on the New York Stock Exchange under the ticker symbol BNED.[5] The individual defendants (with the Company, "Defendants") were members of the Company's board of directors (the "Board").[6] Defendant Michael P. Huseby served as Chairman of the Board and CEO of the Company.[7]

Between February and June of 2019, Plaintiff submitted four proposals to purchase the Company's outstanding equity.[8] The Board rejected each of these

---

[1] C.A. No. 2019-0539-KSJM, Docket ("Dkt.") 1, Verified Compl. ("Compl.") ¶ 6; Dkt. 43, Defs.' Answer & Affirmative Defenses to Pl.'s Verified Compl. ("Ans.") ¶ 6.

[2] Compl. ¶ 6; Ans. ¶ 6.

[3] Compl. ¶ 8; Ans. ¶ 8.

[4] Compl. ¶ 1; Ans. ¶ 1.

[5] Compl. ¶ 7; Ans. ¶ 7.

[6] Compl. ¶ 10; Ans. ¶ 10.

[7] Compl. ¶ 9; Ans. ¶ 9.

[8] Compl. ¶ 14, Ans. ¶ 14; (2/7/19 proposal); Compl. ¶ 15, Ans. ¶ 15 (3/8/19 proposal); Compl. ¶ 16, Ans. ¶ 16 (6/7/19 proposal); Compl. ¶ 18, Ans. ¶ 18 (6/27/19 proposal).

proposals.[9] Plaintiff's counsel, Daniel Gordon, suggested that Plaintiff could nominate a competing slate of directors for election at the 2019 annual meeting.[10] Plaintiff resolved to explore this possibility.[11]

Since August 2015, the Company's bylaws have contained an advance notice provision requiring that a stockholder seeking to nominate director candidates for election at an annual meeting deliver "notice of nomination" of director candidates "not less than 90 days . . . prior to the first anniversary of the date of the immediately preceding annual meeting."[12] Based on the date of the 2018 annual meeting, the nomination deadline for the 2019 annual meeting was June 27, 2019. The bylaw also requires that the stockholder be "a holder of record . . . at the time of giving of the notice," which this decision refers to as the record-holder requirement.[13] The

---

[9] Compl. ¶ 14, Ans. ¶ 14 (2/7/19 proposal); Compl. ¶ 15, Ans. ¶ 15 (3/8/19 proposal); Compl. ¶ 16, Ans. ¶ 16 (6/7/19 proposal); Compl. ¶ 18, Ans. ¶ 18 (6/27/19 proposal).

[10] Dkt. 72, Aff. of Brian S. Yu in Supp. of Defs.' Opening Br. in Supp. of Their Mot. for Summ. J. & an Award of Fees & Costs ("Yu Aff.") Ex. 11, at BC EXP 0065711 (Gordon emailing Suri on 6/4/19: "We would give the CEO Y days to respond and advise him that absent a sale we intend to pursue either a public tender offer for the company or the nomination of a new slate of directors in advance of their September annual meeting."); Yu Aff. Ex. 12, at BC EXP 0095826–27 (Gordon emailing Suri on 6/12/19, to summarize his research of the Company's governance documents and suggest that Plaintiff could "nominate a replacement slate of Directors to be voted upon at the next annual meeting").

[11] Yu Aff. Ex. 12, at BC EXP 0095825 (Suri responding to Gordon on 6/12/19: "Why don't you think of some candidates and I some").

[12] Yu Aff. Ex. 4, art. III, § 3 (Company bylaws effective September 21, 2017); *see also* Yu Aff. Ex. 5, art. III, § 3 (Company bylaws effective August 1, 2015).

[13] Yu Aff. Ex. 4, art. III, § 3; *see also* Yu Aff. Ex. 5, art. III, § 3.

4

bylaw further provides that "[t]he chairman of the meeting may refuse to acknowledge the nomination of any person not made in compliance with the foregoing procedure."[14]

Plaintiff was generally advised of the nomination deadline as early as April 2019, when Suri retained Citigroup Inc.'s Banking, Capital Markets & Advisory Group ("Citi") to advise Plaintiff on strategies for acquiring the Company.[15] Suri directed Citi to "to review all the records," which included the Company's bylaws.[16] On April 18, Citi made a presentation to Suri. In an analysis based explicitly on the Company's bylaws, Citi identified the Company's "Advance Notice Requirement" as one of the potential "Limits on Ability to Change the Board."[17] Citi further advised: "Nominations and proposals must be received between 90 and 120 days prior to the first anniversary of the preceding year's annual meeting."[18] Suri received this presentation and recalled reviewing it.[19]

---

[14] Yu Aff. Ex. 5, art. III, § 3.

[15] *See* Yu Aff. Ex. 10, at BC EXP 0009336 (Citi vice president circulating discussion materials in advance of 4/18/19 conference call).

[16] Yu Aff. Ex. 7 ("Suri Dep. Tr.") at 150:7–20.

[17] Yu Aff. Ex. 10, at BC EXP 0009354 (4/18/19 Citi presentation to Suri summarizing the Company's "Defense Profile").

[18] *Id.* (4/18/19 Citi presentation to Suri).

[19] Suri Dep. Tr. at 90:1–19.

Plaintiff was specifically advised of the record-holder requirement in June 2018. On June 12, after "reviewing [the Company's] Corporate By-laws and other governance documents," Gordon explained that, in order to nominate a slate of directors, Plaintiff would need to first become a stockholder of record:

> It is important that we become a shareholder *and instruct the brokerage firm to designate us as "record holder" of the shares.* Even if it is just 1,000 shares, it is essential that our name appear as a shareholder on the Company's shareholder registry (instead of having our shares lumped in with other customers of Merrill Lynch). Whichever brokerage firm you use *can take steps necessary to designate us as the "record holder" for the shares if they are specifically directed to do so.*[20]

Suri responded that he was "actioning the purchase of the shares" to be held "in the name of Bay Capital."[21] Gordon wrote again on June 13: "Please let me know when the purchase is completed. . . . We will need to move very quickly . . . ."[22] Bay Capital did not purchase any shares in the Company on June 12 or 13.[23]

Plaintiff was advised of an exact date by which he needed to satisfy the record-holder requirement on June 16. Gordon sent Suri an email flagged as "High Importance," which attached a copy of the Company's bylaws and included the

---

[20] Yu Aff. Ex. 12, at BC EXP 0995826 (6/13/19 email chain between Gordon and Suri (emphasis added)).

[21] *Id.* at BC EXP 0995825 (6/13/19 email chain between Gordon and Suri).

[22] *Id.*

[23] Suri Dep. Tr. at 139:4–6.

relevant text of the advance notice bylaw in the body of the email.[24] Gordon

underlined the relevant bylaw language concerning the nomination deadline:

Please note the following:

- Any record holder of BNED shares may nominate one or more directors for election to the BNED Board of Directors so long as the notice served on the Secretary (the "Notice") is timely. For the Notice to be timely, the Bylaws provide for the following:

*Any stockholder of record entitled to vote for the election of directors at a meeting may nominate persons for election as directors only if timely written notice of such stockholder's intent to make such nomination is given, either by personal delivery or by United States mail, postage prepaid, to the Secretary. To be timely, a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Corporation (i) with respect to an election to be held at an annual meeting of the stockholders, <u>not less than 90 days nor more than 120 days prior to the first anniversary of the date of the immediately preceding annual meeting</u>*

The email then advised: "[T]he preceding annual meeting took place on

September 25, 2018. Therefore, our Notice would need to be served on [the

Company's] Secretary *no later than June 25, 2019*."[25] Suri testified that he recalled

receiving and reviewing this email.[26] Suri responded that he agreed and listed a

number of individuals he considered as possible nominees.[27] He also said that he

would purchase stock in the Company that week.[28] Bay Capital did not purchase

any stock in the Company that week.[29]

---

[24] *See generally* Yu Aff. Ex. 13 (6/16/19 email from Gordon to Suri summarizing and attaching the Company's operative bylaws).

[25] *Id.* at BC EXP 0064466 (emphasis added). Of course, the actual deadline was June 27, 2019, not June 25 as Gordon advised. Although the June 25, 2019 date was a mistake, it is not one that helps Plaintiff's case.

[26] Suri Dep. Tr. at 189:12–190:9, 191:20–192:1.

[27] Yu Aff. Ex. 14, at BC EXP 0064403 (6/16/19 email from Suri listing directors).

[28] *Id.* (6/16/19 email from Suri stating that he "will this week purchase the shares").

[29] *See* Suri Dep. Tr. at 192:24–193:2; *id.* at 195:12–25.

7

Plaintiff received three subsequent communications, each conveyed with increasing urgency, pressing Plaintiff to purchase stock in record name. On June 19, Gordon reminded Suri that, in order to nominate "a new slate of directors . . . we need to be a record holder of shares in [the Company]."[30] Suri responded that day: "The shares are being bought."[31] On June 20, Gordon reminded Suri another time that "we need Bay Capital to be the 'shareholder of record.'"[32] And on June 21, Gordon yet again reminded Suri that Bay Capital's nomination letter "needs to be delivered by June 25, 2019 so as to be considered timely under the Company's By-laws."[33] Suri did not purchase any stock in the Company on June 19, 20, or 21, despite these reminders.

It was not until June 24 that Suri placed an order for 25,000 shares of the Company through a broker.[34] That date risked being too late because the settlement of any trade typically occurs days after the order is placed,[35] and only after a trade

---

[30] Yu Aff. Ex. 15, at BC EXP 0064310 (6/19/19 email from Gordon to Suri).

[31] *Id.* (6/19/19 email from Suri to Gordon).

[32] Yu Aff. Ex. 16, at BC EXP 0064204 (6/20/19 email from Gordon to Suri).

[33] Yu Aff. Ex. 17, at BC EXP 0032644 (6/21/19 email from Gordon to Suri).

[34] Yu Aff. Ex. 18, at BC EXP 0091845 (6/24/19 email from Suri to Gordon forwarding trade confirmation).

[35] Yu Aff. Ex. 21, at CPU0026 (Computershare informing Suri that settlement "normally takes a minimum of 2 business days to process").

is settled can the broker submit a request to register that stock in the name of the purchaser such that the purchaser becomes a holder of record.

Suri forwarded the June 24 order confirmation to Gordon, who again advised Suri: "Please stress to [the broker] the need for [Bay Capital] to be listed as the shareholder of record. Without this status [the Company] can reject the nomination notice."[36] Suri acknowledged this communication.[37] Gordon then emailed the broker and Suri together explaining: "There is one technical element to this process which is *critically important*. The shares acquired by Bay Capital *need to be registered in Bay Capital's name*. In other words, Bay Capital *has to be listed on the company's stockholder registry as the Shareholder of Record*."[38]

Gordon forwarded the trade confirmation to outside counsel engaged by Plaintiff to launch the proxy fight on June 25.[39] Counsel responded that trade confirmation did not evidence that Bay Capital's shares were "held in record name by Bay Capital Finance, LLC."[40] Counsel further advised that the process of moving

---

[36] Yu Aff. Ex. 18, at BC EXP 0091845 (6/24/19 email from Gordon to Suri).

[37] *Id.* (6/24/19 response from Suri: "Yes coming").

[38] Yu Aff. Ex. 19, at BC EXP 0063305 (6/24/19 email from Gordon to Suri (emphasis added)).

[39] *See* Yu Aff. Ex. 20, at BC EXP 0063184 (6/25/19 email from Gordon to Plaintiff's counsel).

[40] *Id.* at BC EXP 0063183 (6/25/19 email from Plaintiff's outside counsel to Gordon) (emphasis in original).

9

the shares into record name "typically takes 1-3 business days."[41] Gordon forwarded that email to JP Morgan and emphasized that "we MUST have the shares listed in record name by June 27, 2019."[42]

On the morning of June 27, Gordon emailed the Company's proxy solicitor, Computershare, to request an "account statement confirming that Bay Capital's shares have been transferred to its Computershare account."[43] Computershare responded around 11:00 a.m. advising that "[a]s of this morning no shares have been credited to the account."[44] After some back and forth with Computershare, Gordon concluded around noon that Bay Capital "[would] not have shares in record name prior to the close of business [on June 27, 2019]."[45]

On the evening of June 27, after Plaintiff learned that it would not timely satisfy the record-holder requirement, Plaintiff submitted a nomination notice.[46] In the notice, Suri represented repeatedly that Bay Capital was a "stockholder of

---

[41] *Id.* at BC EXP 0063183–84 (6/25/19 email from Plaintiff's counsel).

[42] *Id.* at BC EXP 0063183 (6/25/19 email from Gordon forwarding Plaintiff's outside counsel's instructions to JPMorgan).

[43] Yu Aff. Ex. 1, at BC EXP 0062980 (6/27/19 email from Gordon to JPMorgan and Computershare requesting account statement).

[44] *Id.* at BC EXP 0062979 (6/27/19 email from Computershare to Gordon).

[45] *Id.* at BC EXP 0062977 (6/27/19 email from Gordon to Suri).

[46] Compl. ¶ 32; Ans. ¶ 32; Yu Aff. Ex. 22 (6/27/19 Bay Capital Notice of Nomination).

record."[47]   On June 28, Computershare reported to the Company that the shares posted to Bay Capital's account on June 28 and that Bay Capital was thus not "a holder of record as of 6/27/19."[48]

Although the Company bylaws granted Huseby the authority to "refuse to acknowledge" any non-compliant nomination notice, Huseby did not refuse the nomination notice pursuant to that grant of authority.[49]   Rather, the full Board considered Plaintiff's nomination notice at a special meeting on June 28.  At the meeting, the Board "unanimously instructed legal counsel to prepare and deliver to Bay Capital a confirmation that the letter of nomination was invalid under the Company's bylaws."[50]  That same day, Company counsel informed Suri and Bay

---

[47] Yu Aff. Ex. 22, at BNED-0001583; *id.* at BNED-0001585 (stating that Bay Capital held 25,000 shares "in record name"); *id.* at BNED-0001586 (stating: "The Nominating Stockholder hereby represents that it is a holder of record of stock of the Company entitled to vote in the election of directors . . . .").

[48] Yu Aff. Ex. 48, at CPU0021 (6/28/19 email from Computershare).

[49] Dkt. 62. Pl.'s Reply Br. in Further Supp. of Its Mot. for a Prelim. Inj. ("Pl.'s PI Reply Br.") Ex. PX-15, at 13:7–14 (Huseby testifying at his deposition that he did not read Plaintiff's nomination letter); *id.* at 92:21–24 (same); *see also* Yu Aff. Ex. 37, at 47:17–48:25 (Huseby testifying that he did not believe he had discretion to accept a late nomination); *id.* at 93:10–13 (Huseby testifying that the rejection was "a decision made by the board").  When ruling on summary judgment, the Court may consider the factual record developed by the parties at the preliminary injunction phase.  *See, e.g.*, *TrustCo Bank v. Mathews*, 2015 WL 295373 (Del. Ch. Jan. 22, 2015).

[50] Pl.'s PI Reply Br. Ex. PX-14, at BNED-0002330 (minutes of special meeting of the Board).

Capital that the June 27 nomination notice was invalid because Plaintiff failed to timely satisfy the record-holder requirement.[51]

### B. Plaintiff Seeks to "Ratchet Up the Pressure" Against the Company by Pursuing Litigation Based on a False Narrative.

Having missed the deadline due to its own negligence, Plaintiff went looking for a reason to blame the Company. It was in this context that Suri first learned of the 2018 proxy language. In a June 27 email, Gordon advised Suri that the 2018 proxy "appears to be in conflict with the bylaws."[52]

Gordon made a good call: the 2018 proxy in fact contained language conflicting with the advance notice bylaw. Whereas the bylaw pegs the deadline to the *previous* annual meeting, the 2018 proxy pegged the deadline to the *next* annual meeting, providing:

---

[51] Yu Aff. Ex. 24 (6/28/19 letter from Company counsel to Plaintiff and outside counsel). In its reply brief at the preliminary injunction stage, Plaintiff argued for the first time that Defendants "actively work[ed] to disqualify Bay Capital's nomination" by causing the employees at Computershare to "run[] around" in disarray. Pl.'s PI Reply Br. at 3–4. Plaintiff pressed these allegations at the preliminary injunction hearing but again failed to offer a factual basis to support them. Rather, the record reflects "that the meeting date was set in accordance with the Company's historical practices and on a clear day before any dispute arose with Bay Capital." Dkt. 74, Oral Arg. & Rulings of the Ct. on Pl.'s Mot. for a Prelim. Inj. ("PI Oral Arg. Tr.") at 112:24–113:8; *see* Dkt. 55, Transmittal Aff. of Eliezer Y. Feinstein in Supp. of Defs.' Answering Br. in Opp'n to Pl.'s Mot. for Prelim. Inj. ("Feinstein Aff.") Exs. DX-25, DX-27, DX-28, DX-29, DX-11, DX-12, DX-13, DX-14, DX-15, DX-40, DX-41, DX-42, DX-43, DX-44, DX-48. In fact, after the close of business, the Company's counsel even requested that Computershare double check that "there [was] no transfer effected through [June 27] that is not reflected in the list." Yu Aff. Ex. 48, at CPU0022 (6/27/19 email from Company counsel requesting confirmation).

[52] Yu Aff. Ex. 1, at BC EXP 0062977 (6/27/19 email from Gordon to Suri).

12

> In accordance with the charter of the Corporate Governance and Nominating Committee, in order for the Corporate Governance and Nominating Committee to consider a candidate submitted by a stockholder for election at a stockholder meeting, the Company must receive the [requested] information not less than 90 days, nor more than 120 days, prior to such meeting.[53]

Gordon then made a bad call: he advised that Plaintiff could exploit this after-the-fact discovery by resubmitting its nomination notice and "argu[ing] that we were in compliance with the proxy language."[54]

Outside counsel repeated Gordon's advice in an email on June 29, advising Suri that the Company "[had] a discrepancy in [its] 2018 proxy statement which sets forth a different nomination deadline than the Bylaws . . . . It is still an issue for the Company that we can exploit that they disseminated a false and misleading proxy statement last year to shareholders."[55] In a separate June 29 email, Gordon advised that Bay Capital could pursue litigation to "ratchet up the pressure" on the Company to settle with Bay Capital, even though "Delaware case law is strong in terms of permitting the advance nomination period within the Bylaws."[56]

---

[53] Yu Aff. Ex. 6, at 16 (2018 proxy statement). Plaintiff, however, claimed that he could not have known this at the relevant time, because the Company did not disclose the 2019 annual meeting date until August 15.

[54] Yu Aff. Ex. 1, at BC EXP 0062977 (6/27/19 email from Gordon to Suri).

[55] Yu Aff. Ex. 26, at BC EXP 0002227 (6/29/19 email chain between Suri and counsel).

[56] Yu Aff. Ex. 45, at BC EXP 0062763 (6/29/19 email exchange between Gordon and Suri).

Suri approved of Gordon's proposed approach. In response to the first email, Suri wrote: "Perfect. As we are invited to debate – then we should oblige! Pursue unabated."[57] In response to the second email, Suri wrote: "Once we started we cannot pull back or be reticent. We pursue expeditiously."[58]

Plaintiff's advisors executed the strategy. On July 1, Plaintiff sent the Company an "updated Notice of Stockholder Nomination," an exhibit to which confirmed Plaintiff was not a record holder until June 28.[59] In a separate July 1 letter from counsel, Plaintiff identified the discrepancy between the advance notice bylaw and the 2018 proxy statement and demanded that the Company accept Plaintiff's nomination notice.[60]

Although Gordon had initially advised that Plaintiff should "argue that we were in compliance with the proxy language,"[61] there was no way for Plaintiff to know at the time whether the nomination in fact complied with the proxy language. This is because the Company had not yet announced the 2019 annual meeting date

---

[57] Yu Aff. Ex. 26, at BC EXP 0002227 (6/29/19 email from Suri to Plaintiff's counsel).

[58] Yu Aff. Ex. 45, at BC EXP 0062763 (6/29/19 email from Suri to Gordon).

[59] Yu Aff. Ex. 25, at BNED-0001449 (7/1/19 email from Plaintiff's counsel to the Company); *id.* at BNED-0001474 ("Direct Registration Advice" indicating the June 28, 2019 record date).

[60] Yu Aff. Ex. 2, at 2 (7/1/19 letter from Plaintiff's counsel to the Company).

[61] Yu Aff. Ex. 1, at BC EXP 0062977 (6/27/19 email from Gordon to Suri).

from which to count back to the deadline as specified in the 2018 proxy statement.[62]

Perhaps in view of this dilemma, Plaintiff made a subtle but important shift in strategy, arguing that it relied on, rather than complied with, the 2018 proxy disclosure. The letter stated:

> Bay Capital *relied on the Company's proxy disclosure in formulating its plans and timing in nominating a slate of directors for the Annual Meeting*, and only upon its discovery of the earlier purported deadline under the Bylaws, delivered the Nomination while its shares were in the process of being transferred into record name.[63]

Of course, Plaintiff's claim of reliance was false. Plaintiff never relied on the proxy language in "formulating its plans and timing." Plaintiff relied on the advance notice bylaw and did not even know of the proxy language until after it missed the relevant deadline.

Plaintiff repeated the lie in pleadings filed with this Court. After the Company responded by denying the July 1 demand,[64] Plaintiff commenced litigation seeking a preliminary injunction to require the Company to include Plaintiff's nominated slate of directors for election at the annual meeting.[65] In the Verified Complaint

---

[62] Coincidentally, it was later revealed that the 2018 proxy's computation method derived the same June 27 deadline established by the bylaw.

[63] Yu Aff. Ex. 2, at 2 (7/1/19 letter from Plaintiff's counsel to the Company (emphasis added)).

[64] Feinstein Aff. Ex. DX-61 (7/2/19 letter from Company counsel explaining that Bay Capital's nomination was "untimely and invalid").

[65] Compl. ¶ 5.

filed on July 15, Plaintiff claimed that it relied on an inaccurate Company disclosure in the 2018 proxy to determine the deadline by which director nominations were due.[66] Plaintiff further claimed that Huseby breached his fiduciary duties by refusing Plaintiff's nomination. In the motion to expedite, Plaintiff represented that "Bay Capital initially relied on the Company's 2018 Proxy Statement under which it faced no imminent deadline."[67]

The Court granted Plaintiff's motion to expedite on July 22, 2019. In doing so, the Court placed great weight on the clear inconsistencies between the advance notice bylaw and the 2018 proxy language, as well as Plaintiff's assertion that it had relied on the 2018 proxy language and thus "had no way of knowing what that deadline was" because the date of the 2019 annual meeting had yet to be announced.[68]

---

[66] *Id.* ¶ 30 ("Bay Capital relied on the 2018 Proxy, under which it faced no imminent deadline. Upon review of the Bylaws, however, the error in the 2018 Proxy became apparent.").

[67] Dkt. 2, Pl.'s Mot. for Expedited Proceedings ¶ 5; *see also* Dkt. 53, Telephonic Oral Arg. & Rulings of the Ct. on Pl.'s Mot. for Expedited Proceedings at 5:8–12 (Plaintiff's counsel arguing: "Bay Capital is entitled to a declaratory judgment that the [C]ompany's erroneous statements caused confusion about the proper timing and the process for the nomination of directors").

[68] Dkt. 53 at 29:11–31:13; *see also* PI Oral Arg. Tr. at 38:1–11, 96:11–17 ("Because, as of June 27th, the [C]ompany had not yet announced to its stockholders the date of the 2019 meeting, Bay Capital did not believe that deadline applied, I was told. . . . [I]t was on this theory that I deemed Bay Capital's claims colorable . . . .").

## C. Plaintiff's Litigation Conduct

Plaintiff requested expedition, and (in the "be careful what you ask for" category) Plaintiff was granted expedition. After receiving an August 14 hearing date, Suri realized that it might interfere with his travel plans, and his enthusiasm for expedition appeared to wane. Plaintiff's counsel wrote to the Court explaining that "Suri . . . [would] be out of the country between the commencement of discovery and August 14,"[69] and therefore Suri was unavailable to be deposed absent scheduling relief. The Court denied the Plaintiff's requested scheduling relief and ordered that Suri make himself available for a deposition during the discovery period.[70]

Suri then made himself available for a deposition, but he required Defendants' counsel to depose him in London. He arrived at his deposition 30 minutes late,[71] left in the middle of the deposition for over two hours to attend meetings he had

---

[69] Dkt. 23 at 4 (7/24/19 letter from Plaintiff's litigation counsel to the Court requesting adjournment of the preliminary injunction hearing date).

[70] Dkt. 92, Telephonic Scheduling Conference Tr. at 5:19–6:4; *see also id.* at 7:5–10.

[71] *Compare* Suri Dep. Tr. at 110:22 (Plaintiff's litigation counsel stating that he had his client arrive to the deposition at 10:00 a.m.), *with* Dkt. 36, Notice of Dep. of Sunil Suri (start time of 9:30 a.m.).

17

scheduled that same day,[72] and unilaterally terminated the deposition in the middle of defense counsel's questioning.[73]

Worse yet, Suri was evasive in his responses. For example, when asked the value of assets managed by Bay Capital, Suri responded "between one dollar and as much as a billion dollars,"[74] and he refused to provide any narrower range.[75] When pressed for a more precise estimate, Suri responded: "I gave you the range, counselor. I said the value of the assets ranges anywhere from a dollar to a billion dollars. That to me is a reasonable response to your question."[76] When asked the number of people employed by Bay Capital and the number of buildings owned by Bay Capital, Suri responded with additional imprecise ranges.[77]

## D. Defendants Move for Summary Judgment.

At the August 14 preliminary injunction hearing, the Court denied the motion on the ground that Plaintiff was not likely to prevail on the merits of its claim of

---

[72] Suri Dep. Tr. at 147:19–23 (going off the record at 2:36 p.m. before going back on the record at 5:16 p.m.).

[73] *See id.* at 244:16–17 (Suri: "Actually, I don't need to answer any more questions. I am done . . . ."); *id.* at 246:4–12 (Plaintiff's litigation counsel: "We are done. Sir, we are done. . . . You cannot instruct him to do anything. We are leaving.").

[74] *Id.* at 34:17–19.

[75] *See generally id.* at 34:20–39:20.

[76] *Id.* at 36:18–23.

[77] *Id.* at 41:20–22 (employees); *id.* at 14:11–19:23 (buildings).

18

reliance given that Plaintiff's non-compliance with the Company's advance notice bylaw was nobody's fault but its own.[78]

At the end of the preliminary injunction hearing, the Court expressed concerns regarding Plaintiff's litigation conduct and added that "whether this litigation conduct warrants fee shifting" was "an open issue" to be decided at a later date.[79] After efforts to settle the litigation failed, Defendants moved for free shifting and for summary judgment.[80] The parties completed briefing on November 11, 2019,[81] and the Court heard oral arguments on December 19, 2019.[82]

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT TWO.

Summary judgment serves to "avoid a useless trial"[83] and "should, when possible, be encouraged for it should result in a prompt, expeditious and economical

---

[78] PI Oral Arg. Tr. at 115:6–12 (finding that "not even Delaware's strong public policy favoring the stockholder franchise will save Bay Capital from its dilatory conduct. Bay Capital blew the deadline. It then made up excuses for doing so. No record evidence suggests that the company is in any way at fault for that mistake").

[79] *Id.* at 119:16–21.

[80] Dkt. 69, Defs.' Mot. for Summ. J.; Dkt. 70, Defs.' Mot. for an Award of Fees & Costs.

[81] Defs.' Opening Br.; Dkt. 78, Pl.'s Answering Br. to Defs.' Mot. for Summ. J. & an Award of Fees & Costs ("Pl.'s Answering Br."); Dkt. 80, Defs.' Reply Br. in Further Supp. of Their Mot. for Summ. J. & an Award of Fees & Costs.

[82] Dkt. 91, Oral Arg. on Defs.' Mot. for Summ. J. & Fee Shifting & Mot. to Stay Disc. & Rulings of the Ct. on Mot. to Stay Disc.

[83] *McKesson Corp. v. Derdiger*, 793 A.2d 385, 388–89 (Del. Ch. 2002).

ending of lawsuits."[84] Court of Chancery Rule 56 provides that summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[85] A party is entitled to judgment as a matter of law "where there are no material factual disputes."[86] "If, however, there are material factual disputes, that is, if the parties are in disagreement concerning the factual predicate for the legal principles they advance, summary judgment is not warranted."[87] "In discharging this function, the court must view the evidence in the light most favorable to the non-moving party."[88]

The Complaint asserts three Counts:

- In Count One, Plaintiff seeks a declaration that Plaintiff's nomination notice setting forth a slate of candidates was valid and should be presented to the Company's stockholders.

- In Count Two, Plaintiff seeks a declaratory judgment that the Company's CEO Huseby breached his fiduciary duties by improperly rejecting Bay Capital's slate of candidates and not exercising in good faith his discretion to accept the nominations even if they did not strictly comply with the bylaws.

- In Count Three, Plaintiff alleges that the Board and Huseby breached their fiduciaries duties by disclosing misleading information in the

---

[84] *Davis v. Univ. of Del.*, 240 A.2d 583, 584 (Del. 1968).

[85] Ct. Ch. R. 56(c).

[86] *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992) (citing *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979)).

[87] *Id.*

[88] *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

20

Company's annual proxy statement concerning the deadline for submissions to the annual meeting.[89]

In response to Defendants' motions, Plaintiff conceded that Count One had been mooted by the 2019 annual meeting on September 25, 2019, and that Count Three had been mooted by supplemental disclosures issued by the Company on August 15, 2019.[90] Those Counts are dismissed,[91] and this decision addresses Defendants' summary judgment motion as to Count Two only.

In Count Two, Plaintiff points to language in the advance notice bylaw granting the Board chairman discretion to refuse a non-compliant notice of nomination: "The chairman of the meeting may refuse to acknowledge the nomination of any person not made in compliance with the foregoing procedure . . . ."[92] Plaintiff alleges that Huseby breached his fiduciary duties by "[f]ailing to exercise in good faith the discretion granted him under Article III, Section 3 of the Company's Bylaws to accept Bay Capital's nominations even if not submitted in strict compliance with the Bylaws."[93]

---

[89] Compl. ¶¶ 50–60.

[90] Pl.'s Answering Br. at 1, 8.

[91] *Gen. Motors Corp. v. New Castle Cty.*, 701 A.2d 819, 823 (Del. 1997) ("According to the *mootness* doctrine, although there may have been a justiciable controversy at the time the litigation was commenced, the action will be dismissed if that controversy ceases to exist." (citing *Glazer v. Pasternak*, 693 A.2d 319, 320 (Del. 1997))).

[92] Yu Aff. Ex. 5, art. III, § 3.

[93] Compl. ¶ 57.

For Huseby to be liable for breach of his fiduciary duties under Article III, Section 3, Huseby would have had to act pursuant to that grant of authority. He did not.[94] Rather, the full Board considered and rejected the nomination notice at the July 28 special meeting.[95] Plaintiff's claim thus lacks any factual predicate. Plaintiff appears to argue that Huseby *should have* invoked his discretion under Article III, Section 3 to make his own determination, a determination that conflicted with the determination of the full Board. Unsurprisingly, Plaintiff cites to no authority to support this proposition. The Court is aware of none.

Plaintiff's sole ploy in response to Defendants' motion is to state in a Rule 56(f) Affidavit that it requires additional "information regarding any Board investigation into Bay Capital or Mr. Suri."[96] But Plaintiff does not connect this statement to the relevant determination—Huseby's (lack of) action under Article III, Section 3. Moreover, at the summary judgment stage, Rule 56(e) provides that the

---

[94] Yu Aff. Ex. 37, at 47:17–48:25 (Huseby testifying that he did not believe he had discretion to accept a late nomination); *id.* at 93:10–13 (Huseby testifying that the rejection was "a decision made by the board"); *see also* Pl.'s PI Reply Br. Ex. PX-14, at BNED-0002330 (draft minutes of a special meeting of the Board stating that "[t]he Board also unanimously instructed legal counsel to prepare and deliver to Bay Capital a confirmation that the letter of nomination was invalid under the Company's bylaws"); Pl.'s PI Reply Br. Ex. PX-15, at 13:7–14 (Huseby testifying at his deposition that he did not read Plaintiff's nomination letter); *id.* at 92:21–24 (same).

[95] Pl.'s PI Reply Br. Ex. PX-14, at BNED-0002330. Because Plaintiff has not challenged the Board's action, this decision does not and need not address it.

[96] Dkt. 78, Aff. of Sean Bellew in Supp. of Pl.'s Opening Br. Opposing Defs.' Mot. for Summ. J. & an Award of Fees & Costs Pursuant to Ch. Ct. R. 56(f) ¶ 5.

22

non-moving party "must set forth specific facts showing that there is a genuine issue for trial."[97]  "To invoke Rule 56(f), the opposing party must submit an affidavit requesting discovery and stating its scope."[98]  Although this Court has "broad discretion" in permitting additional discovery under Rule 56(f), the onus is on the non-moving party to state "with some degree of specificity, the additional facts sought by the requested discovery."[99]  Plaintiff received documents and deposition testimony from Huseby during expedited discovery,[100] and Plaintiff's Rule 56(f) Affidavit does allege with any degree of specificity additional facts to be sought through additional discovery.[101] Thus, Defendants are entitled to summary judgment on Count Two.

---

[97] Ct. Ch. R. 56(e).

[98] *Corkscrew Min. Ventures, Ltd. v. Preferred Real Estate Invs., Inc.*, 2011 WL 704470, at *3 (Del. Ch. Feb. 28, 2011) (citing *von Opel v. Youbet.com, Inc.*, 2000 WL 130625, at *1 (Del. Ch. Jan. 26, 2000)).

[99] *Ryan v. Lyondell Chem. Co.*, 2008 WL 2923427, at *22 (Del. Ch. July 29, 2008), *rev'd on other grounds*, 970 A.2d 235 (Del. 2009); *see also Wimbledon Fund LP v. SV Special Situations LP*, 2011 WL 378827, at *4 (Del. Ch. Feb. 4, 2011) (explaining that "[t]he purpose of a Rule 56(f) affidavit is to avoid situations where an opposing party receives an adverse judgment on a summary judgment record due to a lack of adequate time for discovery but also to require a party who needs discovery to respond to a summary judgment motion to timely explain what discovery it needs to do so").

[100] *See generally* Yu Aff. Ex. 39 (Huseby deposition transcript).

[101] It bears noting that although Plaintiff's motion for a preliminary injunction was denied on August 14, 2019, Plaintiff did not serve any discovery requests after Defendants moved for summary judgment on September 4, 2019.  Plaintiff also did not serve any discovery requests before it filed its answering brief on October 11, 2019.  A party that delays in taking discovery, despite having had the opportunity to do so, cannot raise its own failure as a defense against summary judgment.  *See Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1033–34 (Del. Ch. 2008); *Lyondell Chem.*, 2008 WL 2923427, at *22

## III. DEFENDANTS ARE ENTITLED TO A PORTION OF THEIR ATTORNEYS FEES AND COSTS.

Bad faith litigation conduct allows a court to shift fees as exception to the American Rule that requires each party to pay its own attorneys' fees.[102] "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[103] "The bad faith exception is applied in 'extraordinary circumstances' as a tool to deter abusive litigation and to protect the integrity of the judicial process."[104] "The party seeking fees must demonstrate by clear evidence that the other party acted in subjective bad faith."[105]

Abuse of the discovery process provides another basis to shift fees. "[S]anctions may be imposed upon anyone participating in a Delaware proceeding who engages in abusive litigation tactics."[106] "The Delaware Supreme Court has

---

(declining to excuse the plaintiff's own delay in requesting additional discovery while the summary judgment motion was pending).

[102] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017).

[103] *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del. 1998) (internal citations omitted).

[104] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (citing *Johnston*, 720 A.2d at 546).

[105] *Shawe v. Elting*, 157 A.3d at 150 (citing *Lawson v. State*, 91 A.3d 544, 552 (Del. 2014)); *see also Beck v. Atlantic Coast PLC*, 868 A.2d 840, 843 (Del. Ch. 2005) (shifting fees were plaintiff and his counsel prosecuted the action in bad faith by "fil[ing] false and misleading complaints with this court that misrepresented factual circumstances at the core of [the] case").

[106] *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 508 (Del. 2005) (collecting cases).

made clear that "'[d]iscovery abuse has no place in our courts.'"[107] To remedy discovery abuses, this Court "has the power to issue sanctions . . . under its inherent equitable powers, as well as the Court's inherent power to manage its own affairs."[108] "[W]hen a party fails to comply with discovery orders of the Court or otherwise engages in discovery abuses, the award of attorneys' fees and expenses to the opposing party is mandatory, absent a showing by the wrongdoer that his actions were substantially justified or that other circumstances make the award unjust."[109]

Plaintiff's misleading statements at the outset and throughout this case warrant fee shifting under the bad faith exception to the American Rule. In the Complaint, Plaintiff averred that it "relied on the 2018 Proxy."[110] Suri signed the Verification to the Complaint, affirming "that the factual allegations contained therein, are true and correct to the best of [his] knowledge."[111] Plaintiff doubled down on this representation in its motion for expedited proceedings, where it stated that "Bay Capital initially relied on the Company's 2018 Proxy Statement."[112] As

---

[107] *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D June 21, 2002*, 2018 WL 6331622, at *8 (Del. Ch. Dec. 4, 2018) (quoting *Holt v. Holt*, 472 A.2d 820, 824 (Del. 1984)).

[108] *Id.* at *10.

[109] *Bader v. Fisher*, 504 A.2d 1091, 1096 (Del. 1986).

[110] Compl. ¶ 30.

[111] Dkt. 1, Verification to Compl.

[112] Dkt. 2, Pl.'s Mot. for Expedited Proceedings ¶ 5.

25

discussed above, the Court granted the motion for expedited proceedings based primarily on this assertion.[113]

As discovery revealed, Plaintiff's claim of reliance was false. In fact, Suri never relied on the 2018 proxy statement, and he was unaware of any discrepancies until June 27, 2019, when Gordon manufactured a basis for ratcheting up the pressure on the Company.[114] Nevertheless, Plaintiff continued to press its claims of reliance and moved for a preliminary injunction. In that motion, Plaintiff again stated that "Bay Capital relied on the Proxy Statements in preparing its slate of director candidates for consideration at the annual meeting, only accelerating the process when it realized the Proxy Statements conflicted internally with the bylaws."[115] At the preliminary injunction hearing, the Court noted that there was "no evidence that [Plaintiff] actually relied on the proxy in waiting until the last minute to buy shares. In fact, the evidence reflects that [Plaintiff] was very much aware of the advance notice bylaws."[116] In response, Plaintiff's counsel stated that "the fact of the matter is, it was relied on."[117] Plaintiff did not provide a factual basis from which anyone could reach that conclusion.

---

[113] PI Oral Arg. Tr. at 96:8–23.

[114] Yu Aff. Ex. 1, at BC EXP 0062977 (6/27/19 email from Gordon to Suri).

[115] Dkt. 51, Pl.'s Opening Br. in Supp. of Its Mot. for a Prelim. Inj. at 15–16.

[116] PI Oral Arg. Tr. at 31:8–13.

[117] *Id.* at 31:18–19.

Plaintiff's discovery abuses further warrant fee shifting. In particular, Suri's conduct during his own deposition raises serious concerns. Plaintiff assigns blame to Defendants for what happened that day, arguing that they "failed to call the court for assistance during the deposition, never requested a meet and confer, and never filed a motion to compel."[118] But Delaware law imposes no such rigid duties on parties seeking fees for discovery misconduct.[119]

In view of Plaintiff's bad faith conduct and abusive litigation tactics, Defendants are entitled to recover a portion of their fees. Defendants are entitled to two-thirds of their fees excluding time spent on the summary judgment briefing.[120] The one-third deduction accounts for fees incurred in connection with the Company's defense of Count Three. As the Court remarked at the preliminary injunction hearing, the 2018 proxy language describing the nomination deadline conflicted with the language of the advance notice bylaw.[121] The Company could

---

[118] Pl.'s Answering Br. at 21.

[119] *See, e.g.*, *CSH Theatres, LLC v. Nederlander of S.F. Assocs.*, 2018 WL 3646817, at *31–36 (Del. Ch. July 31, 2018) (awarding fees and costs in connection with a deposition where deponent "willfully gave nonsensical and nonresponsive answers"), *aff'd sub. nom. In re Shorenstein Hays-Nederlander Theaters LLC Appeals*, 213 A.3d 39 (Del. 2019).

[120] The summary judgment briefing primarily focused on Defendants' fee request, and the Court does not include time spent preparing motions for fee requests in fee awards. *See Beck*, 868 A.2d at 856.

[121] PI Oral Arg. Tr. at 119:22–120:2. Plaintiff argues that it is entitled to a mootness fee in connection with this amendment. But Plaintiff failed to move for mootness fees. Thus, this decision does not address the merits of Plaintiff's argument.

have mooted the issue early on and avoided any fees; it instead chose to litigate. Thus, the Court grants Plaintiff that one-third of Defendants' fees would have been expended on litigation relating to Count Three.[122]

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment and for an Award of Fees and Costs are GRANTED IN PART.

---

[122] *See Beck*, 868 A.2d at 856 (reducing fee award after granting the "charitable assumption" that the defendants would have had to expend over half of their requested fees on a motion to dismiss in the event that the plaintiffs had acted candidly to put forth an otherwise colorable claim).